UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

BERNARD TAYLOR,

       Plaintiff,                                 Case No. 3:19-cv-220

vs.

APEX TOOL GROUP, LLC,                  District Judge Michael J. Newman
                                      Magistrate Judge Peter B. Silvain, Jr.

       Defendant.

---

## ORDER: (1) GRANTING DEFENDANT'S MOTION TO STRIKE (DOC. NO. 33); (2) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 14); AND (3) TERMINATING THIS CASE ON THE DOCKET

---

This employment discrimination case is before the Court on Defendant's motion for summary judgment (Doc. No. 14) and motion to strike an affidavit attached to Plaintiff's opposition memorandum (Doc. No. 33). Both motions are fully briefed. Doc. Nos. 32, 34, 35, 36. The Court held extensive oral argument on the motions on July 26, 2021. Doc. No. 46. No new evidence was introduced at that time.

**I.**

This case arises from Plaintiff's allegation that Defendant -- his former employer -- terminated him because of his race. Doc. No. 3 at PageID 59. Plaintiff -- an African American male -- contends that Defendant's less severe discipline of two white employees for arguably worse conduct reveals Defendant fired him with discriminatory intent. Doc. No. 32 at PageID 1302. The following facts are undisputed.

### A.    Plaintiff Is Investigated for Sexual Harassment

Defendant operates a manufacturing plant in Dayton, Ohio. Doc. No. 3 at PageID 54. In or around April 2014, Defendant hired a new human resources manager -- Kelly Mentzel -- to

oversee employee policy administration and discipline in the plant.  Doc. No. 19 at PageID 705.

Mentzel immediately recognized that the plant had a sexual harassment problem.  *Id.* at PageID

715.  Calendars of nude women hung in the plant, and women called each other "whores" on the

bathroom walls.  *Id.*  Defendant maintained a sexual harassment policy, but it was seldom enforced.

*Id.* at PageID 716.  Mentzel implemented plant-wide sexual harassment training to put employees

on notice that violating the policy could result in termination.  Doc. No. 16-4 at PageID 328–29;

Doc. No. 16-5 at PageID 330; Doc. No. 19 at PageID 716.  Employees were warned that

Defendant's sexual harassment policy was zero-tolerance.  Doc. No. 16-4 at PageID 329.

Plaintiff was among the employees who attended the sexual harassment training in 2015.

Doc. No. 16 at PageID 208; Doc. No. 16-6 at PageID 331.  Plaintiff was ultimately terminated

after an investigation revealed he violated the sexual harassment policy, as well as a policy

prohibiting destruction of company property.  Doc. No. 16-9 at PageID 356; Doc. No. 19-5 at

PageID 811.  He had worked at the plant for twenty-four years prior to his firing.  Doc. No. 16 at

PageID 161.

On September 7, 2017, Paula Kelley -- Plaintiff's coworker who occupied the workstation

next to him -- informed Mentzel that Plaintiff made inappropriate sexual remarks and gestures

about a female supervisor.  Doc. No. 19-4 at PageID 809.  Kelley explained that Plaintiff began

making "funny panting like noises" as the female supervisor walked by.  *Id.*  Kelley asked, "what

was wrong with him," and Plaintiff responded by placing his hands on his chest, saying "I can't

help it, have you seen the size of those things?"  *Id.*  Kelley interpreted Plaintiff's comment and

gesture to refer to the female supervisor's breasts.  *Id.*  Several days later, another employee

reported to Mentzel that Plaintiff had made similar comments to him about the size of the female

supervisor's breasts and used hand gestures to indicate her breasts were "huge and bouncy." *Id.* at PageID 810.

Kelley also complained to Mentzel that Plaintiff removed property from her workstation. *Id.* at PageID 809. In one instance, a coworker gave Kelley a basket of tomatoes by placing it on her toolbox. *Id.* Plaintiff affixed a sign to the basket that said "FREE" and permitted their colleagues to help themselves to the tomatoes. *Id.* Kelley also accused Plaintiff of throwing away a chair where Kelley placed her belongings. *Id.* All three allegations prompted Mentzel to open an investigation into Plaintiff's conduct. *Id.* at PageID 809.

### B. Plant Discipline Is Governed by a Collective Bargaining Agreement

Plant employees -- including Plaintiff -- are represented by the United Automobile, Aerospace, and Agricultural Implement Workers of America (the "Union"). Doc. No. 16-8 at PageID 334. The collective bargaining agreement ("CBA") entered into by the Union and Defendant sets forth a progressive discipline structure. *Id.* at PageID 347. Relevant in Plaintiff's case are two types of disciplinary measures: a suspension pending investigation and a suspension pending discharge. Doc. No. 18 at PageID 444; Doc. No. 19 at PageID 732. Though similar sounding, the two actions carry different consequences and trigger separate CBA protections. Doc. No. 16-8 at PageID 347; Doc. No. 19 at PageID 732.

Management might issue a suspension pending investigation to temporarily send an employee home to probe possible workplace policy violations. Doc. No. 19 at PageID 732. If an employee is cleared by the investigation, he or she is reinstated and given backpay for their absence. *Id.* at PageID 745. The CBA does not explicitly provide for employee protections while suspended pending investigation. Doc. No. 16-8 at PageID 347.

It is standard plant practice for the Union to represent an employee whenever management might mete out discipline or investigate alleged workplace misconduct. Doc. No. 18 at PageID

443.  Union shop chairman Eric Milner explained that an employee can request that his or her Union committeeperson be present before management issues a verbal or written warning.  Doc. No. 18 at PageID 442–43.

A suspension pending discharge is a notice that management intends to terminate an employee.  Doc. No. 18 at PageID 444; Doc. No. 19 at PageID 731–32; Doc. No. 19-1 at PageID 804.  Notice of the suspension pending discharge must be distributed to the affected employee and the Union shop chairperson.  Doc. No. 16 at PageID 347.  Article 23 of the CBA affords either the employee or Union shop chairperson five days to request a hearing with management to discuss the circumstances of the employee's termination and potentially negotiate reinstatement.  *Id.*  The employee, Union shop chairperson, and the employee's Union committeeperson are all entitled to appear at and participate in the hearing.  *Id.*  Management is obligated to identify the circumstances that led to the termination decision during the Article 23 hearing.  *Id.*

An Article 23 hearing can go one of three ways.  The employee and Union could accept the termination, the Union might file a grievance contesting the discipline, or the Union and management can negotiate a so-called "last-chance agreement."  Doc. No. 18 at PageID 448–49; Doc. No. 19 at PageID 745–46; Doc. No. 27 at PageID 1256.  A last-chance agreement is a deal between the employee, the Union, and management to bring the employee back subject to certain conditions.  Doc. No. 27 at PageID 1256.  In exchange for reinstatement, the employee acknowledges that he or she will be terminated for a subsequent policy violation.  *Id.*  The Union must also agree not to grieve the conditions imposed by the last-chance agreement or termination prompted by violation of the last-chance agreement.  *Id.*  As Milner explained, last-chance agreements represent the Union's effort "to do whatever [it takes] to keep that [employee] from being discharged."  Doc. No. 18 at PageID 446.

4

### C.        Plaintiff Is Terminated Following an Investigation

On September 7, 2017, the day the allegations surfaced, Plaintiff's supervisor, Joe Pietro, called him into his office and informed him he was being accused of sexual harassment. Doc. No. 21 at PageID 924. Plaintiff denied the accusation and explained he was just making a "what's up" gesture by throwing his elbows back with his hands underneath his armpits. *Id.* at PageID 925–26.

After speaking with Kelley, Mentzel decided it was necessary to suspend Plaintiff pending investigation. Doc. No. 21-1 at PageID 952. Plaintiff was sent home for the rest of the day and notice of his suspension was given to Milner. *Id.* Mentzel called Plaintiff in to the plant on September 12, 2017 for an interview. Doc. No. 19 at PageID 782; Doc. No. 19-4 at PageID 809.

Mentzel requested Pietro to ask Deb Conley -- Plaintiff's Union committeeperson -- to represent him during the interview. Doc. No. 21 at PageID 931. Milner caught wind of this and relayed to Pietro that he, and not Conley, should attend Plaintiff's interview. *Id.* at PageID 932. Pietro explained to Milner that "this was just an investigation" and it was "standard practice that the [committeeperson] [sits] in on investigations." *Id.* Milner, unmoved, went to Mentzel to communicate his intention to represent Plaintiff. *Id.* Mentzel agreed with Pietro that Conley, not Milner, was the appropriate Union representative to attend Plaintiff's interview. Doc. No. 19-4 at PageID 809. Pietro sent Conley to inform Milner that she was supposed to represent Plaintiff, but Milner blocked her from participating in the meeting. Doc. No. 21 at PageID 935–36; Doc. No. 26-1 at PageID 1228. When Mentzel and Pietro informed Plaintiff that Milner was preventing Conley from representing him, Plaintiff expressed that he wanted Milner to attend instead. Doc. No. 19-4 at PageID 809; Doc. No. 21 at PageID 935–36. Mentzel gave Plaintiff the option of either answering the questions without representation or permitting the investigation to move forward without his input. Doc. No. 19-4 at PageID 809; Doc. No. 21 at PageID 937. Plaintiff

expressed that "he wanted union representation" and left the plant before the interview. Doc. No. 19-4 at PageID 809; Doc. No. 21 at PageID 937.

Later in the day, Milner drafted a letter to Mentzel contending that Plaintiff was entitled to a hearing with the Union shop chair and his committeeperson present. Doc. No. 26 at PageID 1184. Milner argued that Plaintiff was entitled to Union representation under Article 23 of the CBA "[d]uring this five[-]day period of suspension." *Id.* Mentzel replied that Article 23 only applied when an employee was suspended pending discharge, but, here, the investigation into Plaintiff had not yet concluded and no termination decision had been made. Doc. No. 18-1 at PageID 687. Milner filed a formal grievance with Pietro the following day contending that he and Mentzel frustrated the CBA by not permitting Milner to represent Plaintiff. Doc. No. 16-7 at PageID 332.

Plaintiff eventually sat for an interview with Mentzel on September 18, 2017. Doc. No. 19-4 at PageID 810; Doc. 26 at PageID 1187. This time, both Milner and Conley attended. Doc. No. 19-4 at PageID 810; Doc. 26 at PageID 1187. Plaintiff denied making comments about or gestures representing the female supervisor's breasts. Doc. No. 19-4 at PageID 810; Doc. 26 at PageID 1187. But he did acknowledge he threw away Kelley's chair. Doc. No. 19-4 at PageID 810; Doc. 26 at PageID 1187.

Mentzel decided to terminate Plaintiff on that same day and issued him a suspension pending discharge. Doc. No. 19-5 at PageID 811; Doc. No. 26 at PageID 1189. Both Plaintiff and Milner received copies. Doc. No. 16 at PageID 248–49; Doc. No. 19-5 at PageID 811; Doc. No. 26 at PageID 1189. Plaintiff's copy was waiting for him at home after the interview. Doc. No. 16 at PageID 249; Doc. No. 19 at PageID 784–85. Milner requested an Article 23 hearing that was held two days later. Doc. No. 26 at PageID 1190. None of the hearing attendees took

6

contemporaneous notes, and Milner was not sure whether he requested a last-chance agreement on Plaintiff's behalf during the hearing. Doc. No. 18 at PageID 544, 548–49. Fourteen days after Plaintiff's Article 23 hearing -- the deadline by which to grieve the circumstances of his termination -- Mentzel sent Plaintiff a letter confirming that his employment was terminated. Doc. No. 16-8 at PageID 347; Doc. No. 16-9 at PageID 356.

Instead of contesting Plaintiff's termination under the CBA, Milner and the Union continued to argue that Defendant violated the CBA by blocking Milner's participation in the September 12, 2017 investigatory meeting. Doc. No. 26 at PageID 1192. Union international representative Gary Jordan brought the matter to an arbitrator who pointed out that the grievance initiated by Milner dealt with Plaintiff's Union representation, not his discipline. *Id.* at PageID 1198. Before the arbitrator could hold a hearing, Jordan withdrew the grievance. *Id.*

### D. Ed Ash and Robb Neff

Ed Ash and Robb Neff are two white plant employees. Doc. No. 3 at PageID 56. Ash was investigated for making unwanted sexual advances towards another female employee. Doc. No. 19 at PageID 721; Doc. No. 28 at PageID 1264. Ash, on several occasions, asked if she wanted to pursue a relationship with him even though he knew she was married. Doc. No. 28 at PageID 1264. The female employee continually rebuffed his requests, and, at one point, Ash lashed out by calling her a "n***** lover." *Id.* Mentzel and another plant manager probed the allegations and concluded that while Ash's actions constituted harassment, the female employee lacked credibility because she had previously directed sexual gestures at him and contradicted herself during her interview. Doc. No. 19 at PageID 734; Doc. No. 20-1 at PageID 885; Doc. No. 27 at PageID 1237, 1239. Ash was suspended pending investigation but returned to work after Mentzel issued him a final written warning, a punishment less severe than a last-chance agreement. Doc. No. 20-1 at PageID 885. Mentzel explained she agreed to the final written warning after

negotiating with the Union and because Ash took responsibility for leaving his work area to speak to the female employee. Doc. No. 19 at PageID 746.

Neff was ultimately terminated for violating the sexual harassment policy. Doc. No. 18 at PageID 479–80. Several employees accused Neff of showing them a photo of his unconscious, nude girlfriend without their consent. Doc. No. 19 at PageID 752. Neff was also reported for making sexual comments to other employees, leaving his work area, and threatening a coworker to a fight. Doc. No. 27 at PageID 1252–53. Mentzel suspended Neff pending discharge soon after the allegations surfaced. Doc. No. 27 at PageID 1255. Milner proposed a last-chance agreement during Neff's Article 23 hearing. Doc. No. 19 at PageID 764. Mentzel allowed Neff to return on a last-chance agreement even though Neff had previously been issued a last-chance notice -- a warning that future policy violations "could result in termination" -- for sleeping on the job. Doc. 18 at PageID 476–77; Doc. No. 19 at PageID 764; Doc. No. 20 at PageID 862; Doc. 26-1 at PageID 1222, 1226.

### E. Procedural History

Plaintiff filed a one-count complaint in the Montgomery County, Ohio Court of Common Pleas alleging Defendant violated Ohio Revised Code § 4111.02. Doc. No. 3. Defendant removed the case to this Court on the basis of diversity jurisdiction, 28 U.S.C. § 1332. Doc. No. 1.[1] Defendant now seeks summary judgment dismissal of Plaintiff's claim. Doc. No. 14. It also asks the Court to strike Jordan's affidavit attached to Plaintiff's summary judgment opposition memorandum. Doc. No. 33.

---

[1] Defendant is a Delaware corporation with its principal place of business in Maryland. Doc. 1-7 at PageID 51. Plaintiff is an Ohio resident. Doc. No. 3 at PageID 54. The Court therefore has subject matter jurisdiction over this case. 28 U.S.C. § 1332.

## II.

The Court will first address Defendant's motion to strike Jordan's affidavit.  Doc. No. 33.  Jordan avers to certain allegations about Plaintiff's discipline, including that he proposed a last-chance agreement on Plaintiff's behalf.  Doc. No. 32-2.  Plaintiff did not disclose Jordan as someone with discoverable information in his Rule 26(a)(1)(A)(i) disclosures or in response to Defendant's interrogatory to identify individuals with discoverable knowledge.  Doc. No. 33-1 at PageID 1332, 1359.  Plaintiff never supplemented his list of relevant persons to identify Jordan.  Doc. No. 35 at PageID 1395.  As a result, Jordan never sat for a deposition.  Doc. No. 36 at PageID 1414.

Defendant argues Jordan's affidavit should be ignored under Rule 37(c)(1).  Doc. No. 33 at PageID 1323–24.  Plaintiff contends his non-disclosure was harmless because Jordan was known to Defendant before the litigation even began.  Doc. No. 35 at PageID 1395.  Plaintiff also points out that Defendant attached Conley's affidavit to its summary judgment motion without forewarning, making, in his view, defense counsel equally as blameworthy.  *Id.* at PageID 1396.

Rule 26(a) provides that within 14 days of the Rule 26(f) pretrial conference, a party must identify "the name and, if known, the address and telephone number of each individual likely to have discoverable information -- along with the subjects of that information -- that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."  Fed. R. Civ. P. 26(a)(1)(i).  A party's failure to identify witnesses per Rule 26(a) means "the party is not allowed to use that information or witness to supply evidence on a motion, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  "Rule 37 authorizes -- indeed, directs -- exclusion of the witness as a sanction for a Rule 26 violation."  *Smith v. Botsford Gen. Hosp.*, 419 F.3d 513, 517 (6th Cir. 2005).

To determine whether a party's "omitted or late disclosure is 'substantially justified' or 'harmless,'" the Court considers five factors: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Howe v. City of Akron*, 801 F.3d 718, 747–48 (6th Cir. 2015) (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396–97 (4th Cir. 2014)). The Court finds that the balance of the factors favor exclusion of Jordan's affidavit.

### A.      Surprise and Importance of the Evidence

Plaintiff argues that his late disclosure of Jordan's affidavit was harmless because Defendant knew who Jordan was and could have noticed his deposition at any time during the discovery period. Doc. No. 35 at PageID 1395. But this position understates the importance of the information Jordan offers. Doc. No. 32-2 at PageID 1318. Jordan is the only witness who affirmatively testifies that the Union proposed a last-chance agreement on Plaintiff's behalf. *Id.* Milner did not remember doing so, and Plaintiff believed Defendant should have offered one to him. Doc. No. 16 at PageID 150, 308; Doc. No. 18 at PageID 548–49. Plaintiff's choice -- to disclose Jordan as a witness after the discovery deadline -- prevented Defendant from mounting a defense to one of Plaintiff's central allegations. Doc. No. 32 at PageID 1308. That Defendant could have deposed Jordan goes to show it should have, and probably would have, but for Plaintiff's late disclosure. *See, e.g.*, *Caudell v. City of Loveland*, No. 1:03-cv-69, 2006 WL 971051, at *2–3 (S.D Ohio Apr. 10, 2006) (disregarding affidavit of a late-disclosed witness who presented crucial information because the opposing party was deprived of an opportunity to probe the witness's account), *aff'd*, 226 F. App'x 479 (6th Cir. 2007). Factors one and four, therefore, support striking the affidavit.

### B.    Ability to Cure and Disruption to Trial

Plaintiff makes no effort to explain how he could cure his surprise.  Doc. No. 35 at PageID 1395–97.  Though the Court vacated the parties' trial date when this case was transferred to its docket and has yet to set a new one, extending discovery would cause other complications.  *See, e.g.*, *Hobart Corp. v. Dayton Power & Light Co.*, No. 3:13-cv-115, 2020 WL 5106743, *5 (S.D. Ohio Aug. 31, 2020) (finding that while permitting additional discovery for newly-disclosed expert witnesses may not interrupt trial, it would "wreak significant havoc in other ways").  Plaintiff relies on Jordan's affidavit to support his argument that genuine disputes of material fact preclude summary judgment.  Doc. No. 32 at PageID 1308.  If discovery was re-opened so Defendant could depose Jordan, Defendant would also be entitled to call other witnesses who participated in the meeting where Jordan allegedly requested a last-chance agreement.  Doc. No. 32-2 at PageID 1318.  Summary judgment would necessarily have to be re-briefed to accommodate this new testimony.  Doc. No. 32 at PageID 1308; Doc. No. 34 at PageID 1383.  Plaintiff, in effect, would be rewarded for his gamesmanship.  *See, e.g.*, *Bisig v. Time Warner Cable*, 940 F.3d 205, 219 (6th Cir. 2019) (quoting *Bentley v. Highlands Hosp. Corp.*, No. cv 15-97, 2016 WL 5867496, at *10 (E.D. Ky. Oct. 6, 2016)) (internal quotations omitted) (the purpose of the *Howe* factors is to "separat[e] 'honest,' harmless mistakes from the type of 'underhanded gamesmanship' that warrants the harsh remedy of exclusion").  Factor two, but not three, favors exclusion.

### C.    Plaintiff's Explanation for Nondisclosure

Plaintiff's reason why his tardy disclosure was substantially justified does not directly address Defendant's arguments.  Doc. No. 35 at PageID 1396.  Though he might be correct that Defendant should have disclosed Conley as a witness before attaching her affidavit to its motion for summary judgment, that is not an excuse for *his* nondisclosure.  Doc. No. 33-1 at PageID 1332, 1359.  Plaintiff claims he became aware of Jordan only four months prior to the discovery deadline.

11

Doc. No. 35 at PageID 1395. But this explanation is dubious considering that Jordan states he participated in Plaintiff's October 23, 2017 post-termination grievance hearing and submitted Plaintiff's claim to an arbitrator. Doc. No. 32-2. Moreover, four months is more than sufficient time to have scheduled, and taken, Jordan's deposition. Factor five, therefore, supports exclusion, and the Court will disregard Jordan's affidavit while considering Defendant's summary judgment motion. Fed. R. Civ. P. 37(c)(1) and 56(c)(2); *Emmanuel v. Cnty. of Wayne*, 652 F. App'x 417, 424–25 (6th Cir. 2016) (district court did not abuse its discretion by striking affidavit where, "[a]t a minimum, the arguments in [prejudiced party's] summary judgment brief would have been structured differently to take account of the new information"); *Gipson v. Vought Aircraft Indus., Inc.*, 387 F. App'x 548, 554–55 (6th Cir. 2010) (upholding district court's decision to strike affidavit because the plaintiff was aware of the information in the affidavit well before discovery closed).

## III.

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex Corp.*, 477 U.S. 317, 323 (1986); *Lansing Dairy. Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). The moving party must either point to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *See* Fed. R. Civ. P. 56(c)(1)(A), (B). A court considering

12

a motion for summary judgment must view the facts and all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV.

The prohibition of race-based discrimination set forth in Ohio Revised Code § 4112.02(A) matches that outlawed by Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e-2; Ohio Rev. Code § 4112.02(A). Ohio courts have repeatedly held that federal case law developed under Title VIII is "generally applicable" to cases arising under section 4112.02. *See, e.g., Little Forest Med. Ctr. of Akron v. Ohio Civ. Rights Comm.*, 575 N.E.2d 1164, 1167 (Ohio 1991); *Brown v. Corr. Reception Ctr.*, 146 N.E.3d 621, 628 (Ohio Ct. App. 2020); *see also Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003).

Intentional discrimination under Title VII can be proven either through direct or circumstantial evidence. *See, e.g., Peeples v. City of Detroit*, 891 F.3d 622, 633 (6th Cir. 2018). Plaintiff's strategy here is to use circumstantial evidence to prove Defendant terminated him because of his race. Doc. No. 32 at PageID 1302. It is Plaintiff's burden to produce evidence that would "allow a factfinder to draw a reasonable inference that discrimination occurred." *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012). Plaintiff can successfully establish a reasonable inference of discrimination by satisfying the burden-shifting framework set out in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Step one of the *McDonnell-Douglas* test is the *prima facie* case. *See, e.g., Pelcha v. MW Bancorp., Inc.*, 988 F.3d 318, 325 (6th Cir. 2021). Its four elements include that the employee: (1) "is a member of a protected class"; (2) "was qualified for the job"; (3) "suffered an adverse employment decision"; and (4) "was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Arendale v. City of Memphis*, 519

F.3d 587, 603 (6th Cir. 2008). Satisfaction of the *prima facie* case shifts the burden of production to the employer to articulate "legitimate, nondiscriminatory reasons for the adverse employment action." *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020). If the employer demonstrates a "clear and reasonably specific" nondiscriminatory justification, plaintiff faces the burden to prove the given explanation was pretext for discrimination. *Texas Dep't of Cmnty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981). Proof that the employer's stated rationale was not the real reason for the adverse employment action allows the fact finder to infer discriminatory intent. *Miles*, 946 F.3d at 887.

Both parties here agree that Plaintiff satisfies the first three elements of the *prima facie* case. Doc. No. 14 at PageID 115; Doc. No. 32 at PageID 1302. Plaintiff is African-American; he was well-qualified for his job as a machinist; and Defendant terminated his employment. Doc. No. 14 at PageID 115. The parties diverge on whether Plaintiff is similarly situated to his proffered comparators, Ash and Neff. Doc. No. 32 at PageID 1302; Doc. No. 34 at PageID 1384–85. This dispute is where the Court will begin its analysis.

### A. *Prima Facie* Case

Plaintiff's burden to demonstrate a *prima facie* case is one "easily met" and "not onerous." *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 808 (6th Cir. 2020) (quoting *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011)). "To satisfy the similarly-situated requirement, a plaintiff must demonstrate that the comparable employee is similar 'in all of the *relevan*t aspects.'" *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) (emphasis in original) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). The Sixth Circuit has held that, in a disciplinary context, the plaintiff must show that he and the proposed comparator have engaged in acts of "comparable seriousness." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (quotation omitted). Factors relevant to the

similarly-situated inquiry include whether the coworkers "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich*, 154 F.3d at 352 (*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Defendant argues that Plaintiff is not similarly situated to Ash and Neff because the Union's intervention influenced their discipline. Doc. No. 34 at PageID 1385–86. Defendant does not take issue with Plaintiff's comparison of the relative egregiousness of the three men's conduct and, instead, focuses on how the Union failed to request a last-chance agreement on Plaintiff's behalf. *Id.* at PageID 1385–87. Defendant's view is that the three employees were disciplined differently because the Union advocated for them in disparate ways. *Id.*

It is undisputed that the Union's representation of Plaintiff did factor into Defendant's disciplinary decision. Doc. No. 19 at PageID 731. But the circumstances of the Union's advocacy go to whether Plaintiff can demonstrate pretext. *See Provenzano*, 663 F.3d at 813 (warning courts not to "push all of the evidence into the *prima facie* stage"). The similarly-situated element of the *prima facie* cases focuses on whether plaintiff and comparators "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Clayton*, 281 F.3d at 611 (quoting *Mitchell*, 964 F.2d at 583). "[R]elevant aspects in this context include the type of misconduct alleged and its relative severity." *Spratt v. FCA US LLC*, 812 F. App'x 348, 354 (6th Cir. 2020). The Court must "gauge the relative severity of the plaintiff's and comparator's misconduct, in part, by looking to its actual and potential consequences." *Id.*; *see also Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d

769, 781–82 (6th Cir. 2016) (recognizing that the plaintiff's and comparators respective actions caused the same harm).

Plaintiff, Ash, and Neff had similar job responsibilities, were subject to the same sexual harassment policy, and all were disciplined by Mentzel. Doc. No. 16 at PageID 215; Doc. No. 19-4 at PageID 809–10; Doc. No. 27 at PageID 1252–55; Doc. No. 28 at PageID 1264. Each employee's conduct, at the least, made their coworkers feel uncomfortable or offended. Doc. No. 27 at PageID 1240–41, 1251–54. Only Plaintiff, however, was terminated without either a last-chance notice or agreement. Doc. No. 27 at PageID 1257. Plaintiff, therefore, has stated a *prima facie* case.

### B. Nondiscriminatory Reason

The burden now shifts to Defendant to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination. *See Wheat v. Fifth Third Bank*, 785 F.3d 230, 239–40 (6th Cir. 2015). Defendant insists it fired Plaintiff because he violated the plant's sexual harassment policy. Doc. No. 14 at PageID 116–17. Defendant has met its burden because its explanation "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006).

### C. Pretext

It is Plaintiff's burden to demonstrate at least a genuine dispute of material fact over whether Defendant's proffered rational was a pretext for a prohibited discriminatory act. *See Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014). "[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Redlin v. Grosse Point Pub. Sch. Sys.*, 921 F.3d 599, 612 (6th Cir. 2019) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). "To survive

summary judgment, a plaintiff 'must produce sufficient evidence from which a jury could reasonably reject [the defendant's] explanation of why it' took an adverse employment action against the plaintiff." *Id.* "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation.  If so, h[is] *prima facie* case is sufficient to support an inference of discrimination at trial." *Id.* (quoting *Chen*, 580 F.3d at 400 n.4).

Plaintiff attacks Defendant's legitimate and non-discriminatory rationale from two angles. He first insists that Milner did propose a last-chance agreement in his Article 23 hearing, but that Mentzel rejected it with an intent to fire him because of his race.  Doc. No. 32 at PageID 1308. The other is that Defendant cannot rely on the honest-belief rule -- which entitles an employer to summary judgment if the adverse action was a product of a "reasonably informed and considered decision" -- because Mentzel's investigation was tainted with bias.  *Id.* at PageID 1308–11.  None, however, find support in the record.

### 1.

Plaintiff contends that the disparate punishment meted out to Ash, Neff, and himself reveals he was fired with discriminatory intent.  *Id.* at PageID 1306–08.  In Plaintiff's view, Ash's and Neff's conduct was worse, yet Defendant negotiated a last-chance warning and agreement with them and not him.  *Id.*  Plaintiff insists that Defendant has no rational explanation for this difference.  *Id.* at PageID 1308.

Defendant points out that the Union's involvement in the three employees' discipline was a contributing factor to the disparate outcomes.  Doc. No. 34 at PageID 1381–83.  Mentzel believed that the conduct of all three employees warranted termination, but, once the Union intervened on Ash and Neff's behalf, her hands were tied.  *Id.*  Defendant argues that the Union never proposed

17

a last-chance agreement on Plaintiff's behalf and instead arbitrated the representation issue. *Id.* at PageID 1382.

Plaintiff's claim that Milner requested a last-chance agreement on Plaintiff's behalf is not supported by the record. Doc. No. 32 at PageID 1308. The undisputed facts show the opposite: the Union contested the representation issue instead of pursuing a last-chance agreement. Doc. No. 26 at PageID 1184, 1192, 1198–99. Plaintiff was not brought back on a last-chance agreement because the Union did not advocate for him in the same way as it did for the others. Doc. No. 18 at PageID 554, 548; Doc. No. 19 at PageID 745–46, 765, 781; Doc. No. 26 at PageID 1192.

Milner testified that he could not remember whether he proposed that Plaintiff be brought back on a last-chance agreement. Doc. No. 18 at PageID 544, 548. After the September 12, 2017 meeting fell through, Milner demanded Plaintiff receive an Article 23 hearing, even though Mentzel and Pietro explained to Milner that Article 23 of the CBA applied to employees suspended pending discharge, not investigation. Doc. No. 18 at PageID 511–17; Doc. No. 26 at PageID 1184. Milner was undeterred by this clarification. Doc. No. 18 at PageID 512–14; Doc. No. 26 at PageID 1184. He believed that Plaintiff had been suspended pending discharge and, on September 12, only had one more day to receive an Article 23 hearing. Doc. No. 18 at PageID 521. Milner, therefore, was under the impression that Mentzel tried to block him from representing Plaintiff in an Article 23 hearing. Doc. No. 18 at PageID 518; Doc. No. 26 at PageID 1184. In his view, this violated the CBA, and the proper remedy was a restoration of Plaintiff's employment. Doc. No. 18 at PageID 560; Doc. No. 26 at PageID 1184.

Milner turned out to be incorrect. Doc. No. 26 at PageID 1185, 1198–99. Plaintiff was suspended pending investigation from September 8 to September 18, 2017 and was paid during his absence. Doc. No. 34-1 at PageID 1391. Mentzel did not suspend Plaintiff pending discharge

until September 18, 2017.  Doc. No. 27 at PageID 1263.  Though Plaintiff received an Article 23 hearing, where a last-chance agreement presumably would have been discussed, Milner instead continued to press the representation issue.  Doc. No. 18 at PageID 448; Doc. No. 19 at PageID 786.  No participant in Plaintiff's Article 23 hearing took notes, and no one present remembers a last-chance agreement proposal.  Doc. No. 18 at PageID 544, 548–49; Doc. No. 19 at PageID 781.

Instead of trying to save Plaintiff from termination, the Union doubled down on Milner's misunderstanding.  Doc. No. 26 at PageID 1192, 1198–99.  Milner filed a grievance that Mentzel interfered with Plaintiff's representation rights under the CBA.  *Id.* at PageID 1192.  After Mentzel denied the grievance, Jordan stepped in to contest the issue.  *Id.* at PageID 1192, 1198.  Jordan insisted that the Union was grieving the circumstances of Plaintiff's termination, but the arbitrator clarified that the grievance only dealt with Milner's representation of Plaintiff during the September 12 investigatory meeting.  Doc. No. 18 at PageID 55; Doc. No. 26 at PageID 1199.  Not once in the exchange with the arbitrator, or during the grievance process, did the Union propose, discuss, or reference a last-chance agreement.  Doc. No. 26 at PageID 1192, 1198–99.

Had it done so, Defendant would have at least engaged in negotiations.  Mentzel testified that management's authority "ends" once an employee is suspended pending discharge and negotiations with the Union over the termination begin.  Doc. No. 19 at PageID 731.  Either management or the Union can propose a last-chance agreement, but, considering that management believes the employee engaged in conduct warranting termination, the Union must fight for the employee to be given a second chance.  Doc. No. 19 at PageID 731; Doc. No. 32-1 at PageID 1314.

This is how the Ash and Neff cases played out.  Mentzel concluded that both employees should be fired, yet, once the Union requested that they be given a second chance, Mentzel

19

relented.  Doc. No. 19 at PageID 745–46; 758.  Mentzel likewise concluded Plaintiff's conduct warranted termination, but the difference was that the Union did not intervene on Plaintiff's behalf by proposing a last-chance agreement.  Doc. No. 18 at PageID 544; Doc. No. 19 at PageID 780. The Union instead pursued the representation issue, which turned out not to be in Plaintiff's best interest.  Doc. No. 26 at PageID 1184, 1188–89.  That Plaintiff was not brought back on a last-chance agreement does not demonstrate Defendant's non-discriminatory reason was pretextual.

      **2.**

Plaintiff also contends that Defendant's proffered reason was insufficient to, and did not actually, motivate its decision.  Doc. No. 32 at PageID 1308–09.  He advances three arguments why Defendant's investigation was not credible and did not establish a reasonable basis on which to terminate him.  Doc. No. 32 at PageID 1308–11.  Each, in some form, contends that Mentzel ran a biased investigation process.  *Id.*  None, however, are supported by the record.

Plaintiff first insists that Kelley -- the employee who initially reported Plaintiff to Mentzel -- was an unreliable witness who Mentzel should not have believed.  Doc. No. 32 at PageID 1309– 10.  Kelley -- in Plaintiff's view -- had it out for him.  *Id.*  She had previously complained Plaintiff was paid a higher wage than her and had problems with other co-workers.  *Id.*  Plaintiff claims that Kelley should not have been offended by Plaintiff's remarks because Kelley too engaged in sexualized conversations.  *Id.*  But even if Mentzel did not find Kelley credible, Plaintiff fails to acknowledge that a second employee reported Plaintiff for making similar comments and gestures. Doc. No. 27 at PageID 1241.  Mentzel could have disbelieved Kelley but sustained the allegations against Plaintiff on the second employee's word alone.  *Id.*

Plaintiff characterizes Mentzel as intent on obstructing the Union's representation of him and not concerned with the veracity of the allegations.  Doc. No. 32 at PageID 1310.  This is based on the argument that -- in Plaintiff's telling -- Mentzel prevented Milner from sitting in on the

September 12 investigatory meeting.  *Id.*  Not only was Mentzel proven right in her understanding of the CBA, but she allowed Milner to participate in the September 18 meeting and Article 23 hearing.  Doc. No. 19-4 at PageID 810; Doc. 26 at PageID 1187.  Plaintiff declined to meet with Mentzel on September 12 on the advice of Milner who mistakenly believed Plaintiff was suspended pending discharge.  Doc. No. 19-4 at PageID 809; Doc. No. 21 at PageID 937.

Finally, Plaintiff argues that Mentzel's decision to issue a suspension pending discharge prior to their September 18 meeting demonstrates pretext.  Doc. No. 32 at PageID 1310.  To Plaintiff, this suggests that Mentzel was not truly interested in investigating the allegations and that she made up her mind before speaking with him.  *Id.*  He insists that Defendant could not reasonably rely on Mentzel's decision-making process.  *Id.*

Plaintiff overlooks, however, that his version of the events did not change from September 7 to September 18.  He denied to Pietro on September 7 that the gestures were sexual in nature.  Doc. No. 21 at PageID 924–26.  He then offered the same account to Mentzel on September 18.  Doc. No. 19 at PageID 782–83.  Nothing about the allegations, or Plaintiff's denial, shifted between the start of the investigation and Plaintiff's termination.  The set of facts available to Mentzel was no different after the September 18 meeting than it was before.

For that reason, and even assuming the timing of Mentzel's mailing of the suspension pending discharge evidenced pretext, Defendant still could reasonably rely on Mentzel's termination decision.  This is true "even if [Defendant's] conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'"  *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) (quoting *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713–15 (6th Cir. 2007)).  Though Mentzel's choice to issue Plaintiff a suspension pending discharge before the September 18th meeting may have been premature, a reasonable jury could not reject Defendant's honest belief that it fired him for

violating the sexual harassment policy.  *See, e.g.*, *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 572 (6th Cir. 2021) ("An employer's pre-termination investigation need not be perfect in order to pass muster under the [honest-belief] rule") (quoting *Loyd*, 766 F.3d at 591).

Plaintiff has failed to demonstrate pretext.  Defendant's summary judgment motion is, therefore, **GRANTED**.

## V.

For the foregoing reasons, the Court (1) **GRANTS** Defendant's motion to strike (Doc. No. 33); (2) **GRANTS** Defendant's motion for summary judgment (Doc. No. 14); and (3) **TERMINATES** this case on the docket.

**IT IS SO ORDERED.**

Date:  August 31, 2021                                    s/Michael J. Newman
                                                          Hon. Michael J. Newman
                                                          United States District Judge